# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

TIA MARIE-MITCHELL SKINNER,

      Defendant-Appellant.

UNPUBLISHED
November 13, 2018

No. 317892
St Clair Circuit Court
LC No. 10-002936-FC

ON REMAND

Before: SAWYER, P.J., and MURPHY and BORRELLO, JJ.

PER CURIAM.

This case has been remanded to this Court to determine whether the trial court abused its discretion in sentencing defendant, Tia Marie Mitchell Skinner, a juvenile offender, to life without the possibility of parole pursuant to MCL 769.25 following defendant's conviction of first-degree murder, conspiracy to commit murder, and attempted murder. *People v Skinner*, 502 Mich 89, 97; ___ NW2d ___ (2018). For the reasons set forth in this opinion, we affirm defendant's sentence.

## I PROCEDURAL BACKGROUND

Our Supreme Court set forth the procedural history of this case as follows:

Following a jury trial, defendant was convicted of first-degree premeditated murder, conspiracy to commit murder, and attempted murder for acts committed when defendant was 17 years old. Defendant was sentenced to life in prison without the possibility of parole. The Court of Appeals remanded for resentencing under [*Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012)], which held that mandatory life-without-parole sentences for offenders under 18 years old violate the Eighth Amendment.[1] This Court denied

---

[1] *People v Skinner (Skinner I)*, unpublished per curiam opinion of the Court of Appeals, issued February 21, 2013 (Docket No. 306903).

-1-

leave to appeal . . . . On remand, the trial court reimposed a life-without-parole sentence. After defendant was resentenced, MCL 769.25 took effect, setting forth a new framework for sentencing juveniles convicted of first-degree murder. The Court of Appeals remanded for resentencing under MCL 769.25.[2] On remand, the trial court again sentenced defendant to life without parole.

In a split, published decision, the Court of Appeals again remanded for resentencing, holding that a jury must decide whether defendant should be sentenced to life without parole and that, to the extent that MCL 769.25 requires the trial court to make this determination, it is unconstitutional. [*People v Skinner (Skinner II)*, 312 Mich App 15, 877 NW2d 482 (2015)]. This Court granted the prosecutor's application for leave to appeal and directed the parties to address "whether the decision to sentence a person under the age of 18 to a prison term of life without parole under MCL 769.25 must be made by a jury beyond a reasonable doubt[.]"[3] [*Skinner*, 502 Mich at 98-99.]

Following this Court's decision in *Skinner II*, 312 Mich App at 15, but before the Michigan Supreme Court granted leave, in *People v Hyatt*, 314 Mich App 140; 885 NW2d 900 (2016), this Court addressed another case involving a juvenile offender sentenced to life without the possibility of parole. In *Hyatt*, this Court affirmed the defendant's conviction of first-degree, felony murder, among others, and would have affirmed his [life-without-parole] sentence but for [*Skinner II*], which held that a jury must decide whether to impose a life-without-parole sentence on a juvenile. The *Hyatt* Court called a conflict panel, and, in a published decision,[4] "disagreed with [*Skinner II*] and held that a judge may decide whether to impose a nonparolable life sentence on a juvenile." *Skinner*, 502 Mich at 99. However, the *Hyatt* Court vacated the defendant's life-without-parole sentence and remanded the case for resentencing with instruction for the trial court to "not only consider the *Miller* factors, but decide whether defendant Hyatt is the truly rare juvenile mentioned in *Miller* who is incorrigible and incapable of reform." *Hyatt*, 316 Mich App at 429.

The Michigan Supreme Court ultimately granted leave to appeal in both *Skinner II* and *Hyatt*. The Court held as follows:

[W]e reverse the judgment of the Court of Appeals in [*Skinner II*] and affirm the part of *Hyatt* that held that "[a] judge, not a jury, must determine whether to impose a life-without-parole sentence or a term-of-years sentence under MCL 769.25." [*Hyatt*, 316 Mich App at 415]. However, we reverse the part of *Hyatt* that adopted a heightened standard of review for life-without-parole sentences imposed under MCL 769.25 and that remanded this case to the trial court for it to

---

[2] *People v Skinner*, unpublished order of the Court of Appeals, entered July 30, 2014 (Docket No. 317892).

[3] *People v Skinner*, 500 Mich 929; 889 NW2d 487 (2017).

[4] *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016).

"decide whether defendant Hyatt is the truly rare juvenile mentioned in [*Miller*, 567 US at 460] who is incorrigible and incapable of reform." [*Hyatt*, 316 Mich App at 429]. No such explicit finding is required. Finally, we remand both of these cases to the Court of Appeals for it to review defendants' sentences under the traditional abuse-of-discretion standard of review. [*Skinner*, 502 Mich at 97.]

We now examine whether the trial court abused its discretion when it sentenced defendant to life-without-parole.

## II.  ANALYSIS

### A.  STANDARD OF REVIEW

This Court reviews a trial court's sentencing decision under MCL 769.25 for an abuse of discretion. *Skinner*, 502 Mich at 131, (noting that "neither *Miller* nor *Montgomery* requires this Court to deviate from its traditional abuse-of-discretion standard in reviewing a trial court's decision to impose life without parole."). " '[A] given sentence can be said to constitute an abuse of discretion if that sentence violates the principle of proportionality, which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Id*. at 131-132, quoting *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990).  See also *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017) ("[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion."). A trial court also abuses its discretion when it errs as a matter of law. *People v Jackson*, 498 Mich 246, 257; 869 NW2d 253 (2015). A trial court's findings of fact at a sentencing hearing are reviewed for clear error while issues of law are reviewed de novo. *Skinner*, 502 Mich at 137, n 27. "A finding is clearly erroneous if this Court is left with the definite and firm conviction that a mistake has been made." *People v Allen*, 295 Mich App 277, 281; 813 NW2d 806 (2011).

In *Miller*, 567 US at 465, the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments" (quotation marks omitted). However, the *Miller* Court did not categorically bar life-without-parole sentences for juvenile offenders, explaining that such sentences may be imposed in certain circumstances, noting that it would be the "rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified." *Id*. at 479. In doing so, "*Miller* made clear that 'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.' " *Montgomery v Louisiana*, 577 US ___; 136 S Ct 718, 733-734; 193 L Ed 2d 599 (2016), quoting *Miller*, 567 US at 479.

The *Miller* Court held that certain factors should be considered when sentencing a juvenile to life imprisonment without the possibility of parole. *Miller*, 567 US at 477-478. Those factors include:

> [Defendant's] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences; the family and home environment that surrounds him—and from which he cannot

usually extricate himself—no matter how brutal or dysfunctional; the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him; whether he might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys; and the possibility of rehabilitation [*Skinner*, 502 Mich at 104-105 (quotation marks and citation omitted).]

Following *Miller*, the Legislature enacted MCL 769.25 to provide a framework for sentencing juvenile offenders to life without the possibility of parole. Under the statute, following the conviction of a juvenile for first-degree murder, pursuant to MCL 769.25(2) and (3), a prosecuting attorney may move to sentence the juvenile defendant to life imprisonment without the possibility of parole. If the prosecuting attorney moves to impose this sentence, MCL 769.25(6) and (7) govern the sentencing procedure and provide as follows:

(6) If the prosecuting attorney files a motion under subsection (2), the court shall conduct a hearing on the motion as part of the sentencing process. At the hearing, the trial court shall consider the factors listed in [*Miller*, 567 US at 477-478], and may consider any other criteria relevant to its decision, including the individual's record while incarcerated.

(7) At the hearing under subsection (6), the court shall specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed. The court may consider evidence presented at trial together with any evidence presented at the sentencing hearing.

In *Skinner*, 502 Mich at 138, our Supreme Court explained that in reversing *Hyatt's* requirement that a precondition for a life sentence for a juvenile is that the State prove the juvenile defendant incorrigible and incapable of reform, held that "[n]o such explicit finding is required." Similarly, the trial court "does not have to explicitly find that defendant is 'rare.' " *Id*. at 130. Moreover,

[N]either *Miller* nor *Montgomery* imposes a presumption *against* life without parole for those juveniles who have been convicted of first-degree murder on either the trial court or the appellate court. *Miller* and *Montgomery* simply require that the trial court consider an offender's youth and attendant characteristics before imposing life without parole. [*Id*. at 131 (quotation marks and citation omitted).]

B. FACTUAL FINDINGS AND LEGAL CONCLUSIONS OF THE TRIAL COURT

Relative to the underlying facts leading to the conviction in this case, in this Court's first opinion we stated:

The victims, defendant's parents, were viciously attacked in their bed in November 2010. Defendant's father was killed in the attack and defendant's

mother suffered roughly 25 stab wounds. An investigation led to Jonathan Kurtz, defendant's boyfriend, and James Preston. The investigation also led to the discovery of a map of the neighborhood and a note containing tips on how to break into defendant's house and commit the murders. Cell phone records revealed text messages between defendant, Kurtz, and Preston that indicated that the crime had been planned by all three. During an interview with police, defendant implicated Preston, then implicated Kurtz and Preston, and then admitted that she had talked to Kurtz about killing her parents. Defendant said that Kurtz was going to seek Preston's help. [*People v Skinner*, unpublished opinion per curiam of the Court of Appeals, issued February 21, 2013 (Docket No. 306903), p 1.]

Following our initial opinion in this matter, the matter went before the trial court again, for a resentencing hearing. At the September 2014 resentencing hearing, several witnesses testified. Mara Skinner, defendant's adoptive mother, victim, and spouse of deceased victim Paul Skinner, testified at the hearing. Mara testified that she and Paul raised two biological children and two adoptive children, including defendant; all four children were raised as siblings. Defendant was the biological child of Mara's sister Valerie Borja; Valerie was incarcerated at the time of defendant's birth and could not care for defendant. Defendant lived the first 10 months of her life with her biological father in Detroit; she then spent a couple of weeks in foster care before moving to Charlevoix to live with her great grandmother. Defendant began living with Mara and Paul when she was about two years old. Jeffery Skinner was defendant's biological brother and he also lived in the Skinner household.

Mara testified that all of the children in her home were loved; Paul was actively involved in the family and he and defendant had a close relationship. During the time before the murder, Paul was concerned that defendant would move away to attend college and he wanted her to attend a college that was close to the Skinner home in Yale, Michigan. All four of the children had close relationships and spent time together. Mara described holidays, vacations, sporting events, and other occasions that the family spent together. Defendant's three older siblings all attended college and defendant planned to attend Western Michigan University upon graduating from high school.

Mara also testified that defendant was a healthy child; she did not have any developmental issues and she was very happy. Defendant and her three siblings were involved in school sports and defendant was involved in band, and she progressed normally in school and had many friends. Mara testified that she taught school for many years in the Yale elementary and junior high schools; she and Paul made academic success their primary goal for all the children, made sure the children attended and succeeded in school, participated in extracurricular activities, and encouraged and supported all the children in these areas. Defendant was actively involved in her school and was often a leader among her peers and was said to have good relationships with her family and friends.

Mara testified that in 2009 and 2010, defendant was involved with two friends whom were not a good influence. These were the only two occasions when Mara questioned defendant's judgment in choosing her friends. Mara spoke with defendant and asked her not to

have contact with one of her male friends. Defendant became upset with Mara. Mara also stated that on one occasion, defendant had "scratch marks" on her arm.

Mara's brother Marcel Borja testified that he met defendant when she was an infant. He explained that the entire family accepted defendant and included her in family activities and vacations. Marcel never had concerns about defendant; she was always happy and well-adjusted. Defendant did not have any problems with her family, friends, or neighbors. Similar testimony, that defendant was loved and well cared for, was given to the trial court by another of Mara's brothers, Jeff Borja.

Jeffrey Skinner, defendant's biological brother, testified that he grew up in the Skinner household with defendant. He described his family as very close and a family that spent a lot of time together. Jeffrey testified that the Skinner family ensured that the children were protected and happy.

Dr. Carol Holden, Ph.D., a forensic psychologist and the director of the Michigan Forensic Center, testified that she met with and assessed defendant on two occasions and reviewed the April 2011 criminal responsibility evaluation of defendant. She reviewed defendant's criminal responsibility evaluation in light of *Miller*, and explained:

> There was a lot that was absolutely unremarkable. [Defendant] presented at the time with no evidence of mental illness as defined by statute. She was clearly a bright, is and was a bright woman. She spoke of no particular traumatic experiences recently in her home, for example. There were a couple of things . . . that stood out to me as I mentioned about self-centered approach, and a striking lack of appreciation of what this crime could mean for her and those around her.

Dr. Holden testified that it was apparent that defendant grew up in a warm and loving family; however, her very early childhood was "very different" and likely contributed to some difficulties with attachment. Defendant's biological father was involved with drugs and weapons and it was likely that he was a "less than excellent caregiver." Dr. Holden testified that defendant had issues with attachment, having likely had disruptions in her early attachments with caregivers; however defendant was not diagnosed with an attachment disorder. Defendant lived with her biological father for 10 months; she was then in foster care for a short time before moving to Charlevoix to live with grandparents for two years. Defendant then moved to the Skinner home, an "excellent" environment, where she resided for her childhood. Dr. Holden explained that she was not attempting to draw a direct link between defendant's very early childhood disruptions and the crime, however, the disruptions could have impacted defendant's internal view of the world and could provide context for the sentencing court to consider.

Dr. Holden testified that defendant was in middle adolescence at the time of the crime. Adolescence is the period of time when children become comfortable with abstract reasoning. By about age 16, children are able to think and reason in a cognitive way that is similar to that of an adult. However, adolescents are far more "tuned into reward then they are to potential difficulties," and would be more willing to engage in behavior that adults consider risky. Dr. Holden explained that cognitive development occurs during adolescence, but the slowest part of the brain to develop is the pre-frontal cortex, which controls planning, thinking through

problems, and inhibiting impulses. She explained that teenagers do things that are ill considered because of lack of brain development. Overall, Dr. Holden concluded by stating that she did not diagnose defendant with any mental illness or having suffered from any traumatic experiences which may have brought on serious psychological difficulties.

Dr. James Garbarino, Ph.D, testified as an expert in developmental psychology with an emphasis in adolescence. He met with defendant in September 2014 for 90 minutes, reviewed court filings, and other case-related documents. Dr. Garbarino summarized a report that he prepared, explaining that defendant "was a very damaged child early in her life" when "the formation of secure attachments . . . is essential," her "developmental damage carried through into adolescence," the "good quality of her care in later childhood and adolescence" masked much of her damage. According to Dr. Garbarino, defendant also had difficulty or issues with respect to her identity, was vulnerable to peer pressure, experienced serious problems with depression, and had serious issues with social emotional maturity.

Dr. Garbarino testified that defendant employed dissociation to disconnect from her emotions until she reached 15 or 16 years of age; defendant reported crying more, cutting herself, and feeling depressed, at times acting out violently toward the Skinners. His opinion was that defendant's self-harm was indicative of a serious psychological issue, for which defendant did not receive therapeutic help. Dr. Garbarino presumed that defendant's biological father sexually abused her given that she reported sleeping in the same bed with her biological father. He opined that defendant was capable of benefitting from mental health services and other prison services testifying that: "it would be very likely that with mental health intervention and the passage of time she would fully recover from the crisis that has led her to the terrible crime that she committed."

Defendant testified at the sentencing hearing, stating that she did not have any independent memory of living with her father; she recalled living with her great grandmother in Charlevoix, and wanting to stay with her great grandmother. She also testified that she was involved in extracurricular activities in high school. She was involved in a youth group at her church and she babysat for people. Defendant testified that she became "very depressed" when she was 16 and 17 years old. She did not talk to people about her problems. She cut herself with a razor, but she did not obtain counseling for her depression. She continued her cutting behavior where no one could see. In prison, she continued this behavior. Defendant testified that she attended counseling in prison once per month and she was taking medication for anxiety, depression, and OCD.

Defendant acknowledged that she committed the offense for which she was convicted. She testified that she did not know why she committed "a horrendous crime" against a "wonderful family." She stated that she did not have an excuse for her crime. She stated that neither Paul nor Mara ever harmed her or did anything wrong to her. She agreed that the Skinner family never treated her "less than wonderful." Defendant testified that she understood the consequences of her actions before the crime was completed.

After hearing this testimony, the trial court noted its mindfulness of the *Miller* factors, and its difficulty imagining "a case more factually opposite of those concerns than this case." The trial court opined that the defense effort to depict defendant's childhood "from court records

alone and . . . portray her background to fit classical psychological profiles distorts the truth and is a cruel disservice to a family that has suffered not only through the trauma of this horrific murder but three separate trials," and three sentencing hearings.

According to the trial court, although defendant "did not personally inflict the stab wounds," she did not play a passive role in the attack. The trial court specified that it was defendant who instigated "the idea of killing her parents and [was] the architect of the plan"; that defendant "promised her new boyfriend and his buddy money to kill them"; that defendant "drew a map of the neighborhood," the layout of her house, and "even included notes how best to avoid early detection"; that defendant "left her bedroom window open," cut the window screen, and placed "a step ladder outside to allow them to quietly enter the house"; that defendant "left kitchen knives on her bed for [the codefendants] to use in case they were unable to find knives themselves"; that defendant communicated with the codefendants by text messages "almost non-stop that evening to keep everyone posted as events were unfolding"; and that defendant actively prevented her brother from helping the victims.

The trial court rejected that defendant had grown up as "the victim of an abusive or dysfunctional family." In support of the trial court's view that defendant lived in "a l[o]ving and caring home," the trial court observed that the victims and their children had attended "college and held professional positions," Mara Skinner "was a highly respected teacher," the victims, their children, and members of the extended family "treated [defendant] with love and respect and included her in all activities," "attended all of her school and athletic activities," "vacationed together and showered her with attention," frequently hosted defendant's friends in the Skinner house; and defendant performed "well in school and learned after this crime that she had been accepted to Western Michigan University"; and a video presented at the resentencing hearing that documented defendant's life with the Skinner family, including "holiday celebrations, . . . school events, . . . vacations together," and showed the life "she had destroyed and the life that she had given up for herself."

The trial court noted that defendant had exhibited no prior "signs of any emotional or psychological problems," "no prior contacts with the authorities," and had been "very involved in school and church activities." In so finding, the trial court also rejected the defense suggestion that defendant had moved "from one home setting to another early in her life," which "prevent[ed] her from developing appropriate attachment to one adult." Rather, the trial court found that although defendant's biological mother "was a heroin addict when [defendant] was conceived" and gave birth to defendant in prison, defendant's biological father kept her after her birth because the biological mother faced 10 more months of incarceration, the biological mother retrieved defendant "from her biological father's custody because he was [a] drug . . . dealer" and she felt concerned for defendant's safety, the biological mother gave defendant to Mara Skinner, defendant then spent a few weeks in foster care because the biological mother had advised Mara Skinner of her belief that the biological father was dangerous, and Mara Skinner and the biological mother "agreed that . . . the best and safest place for [defendant] was with their grandparents in Charlevoix." The trial court recounted that the victims had "established a relationship with [defendant] even while she was living in Charlevoix," before reaching 2-1/2-years of age defendant "began living full time with the Skinners," and when defendant was between 2-1/2 and 8 years of age, the Skinners facilitated interactions between defendant and her

biological father, who "was a loving and caring man who wanted a relationship with his daughter."

The trial court went on to discredit the opinions of two psychological experts that defendant had experienced circumstances adversely affecting her emotional development by noting that the April 2011 psychiatric and psychological evaluations had reported "no history of depression and nothing in [defendant's] demeanor which suggested a debilitating depression or mania," "no sleep or appetite problems and . . . no symptoms of disorders of th[]ough[t] or mood."

The trial court described Dr. Garbarino's findings as premised on "flawed and inaccurate data." Based, in part on this finding, the trial court went on to conclude that Dr. Garbarino had opined on the basis of inaccurate facts and failed "to adequately account for the positive influence from the Skinners and the lack of any anti-social or emotional issues."

The trial court also considered defendant's potential for rehabilitation, explaining as follows:

> Both defense psychologists suggested that she is a bright individual and could benefit from mental health treatment. That with time and maturity she could gain insight into the gravity of her behavior. A clinician associated with . . . where [defendant] resides, . . . testified that she has been outstanding as a peer educator for incoming prisoners to the facility.

> None of us have a crystal ball. For some, services provided within the prison system truly benefit an individual and they return to society and never reoffend. Others come out worse than before. However, given the legislative restriction now in effect, this factor has less relevance in this state. Even if I were to impose the minimum possible sentence she would still be required to serve at least 25 years before even being given a hearing before the parole board. Given the wide variety of life experiences that she will be exposed to during that time period, no one can make an accurate assessment of who she will be at that point. As a result, I cannot weigh her potential for rehabilitation within any range of predictable outcomes.

### C. DEFENDANT'S SENTENCE IS NOT AN ABUSE OF DISCRETION

Our review of the record leads us to conclude that the trial court did not abuse its discretion in sentencing defendant to life imprisonment without the possibility of parole under MCL 769.25. In this case, the trial court's sentencing decision was "proportionate to the seriousness of the circumstances surrounding the offense and the offender"; therefore, the trial court did not abuse its discretion in sentencing defendant to life imprisonment without the possibility of parole. *Milbourn*, 435 Mich at 636. The trial court properly applied MCL 769.25 and adequately considered the *Miller* factors in rendering its sentencing decision. Specifically, the trial court considered defendant's age, noting that she was 27 days from her 18th birthday at the time of the offenses. The trial court considered the other features of defendant's youthfulness. The trial court noted that there was no evidence that defendant previously

exhibited emotional or psychological issues. Defendant was not previously involved in criminal behavior and there were no signs of peer pressure. Defendant agreed that she formulated the plan to kill her parents. Further, we cannot conclude that the trial court clearly erred when it found that defendant's experts were not credible. In so finding, the trial court stated that defendant's prior psychological evaluation showed no signs of prior mental health issues; however defendant's experts did make those findings, the basis of which were greatly undermined during cross examination.

Additionally, we observe that the trial court considered the relevant evidence and it was free to weigh the credibility of defendant's expert witnesses. Moreover, given our Supreme Court's holding in *Skinner*, it is apparent that the trial court was not required to make an explicit finding with respect to each and every *Miller* factor. Instead, the trial court was required to consider the *Miller* factors and articulate rationale for its decision as required by statute. See MCL 769.25(7). The trial court thoroughly explained the reasoning for its sentencing decision and the court did not abuse its discretion in imposing that sentence. Hence to the extent defendant also argues on appeal that the trial court erred and violated her constitutional rights when it failed to adequately consider her potential for rehabilitation by ignoring relevant mitigation evidence including evidence of attachment issues, we observe that the trial court specifically made findings relevant to defendant's claims of mitigating issues. The fact that the trial court rejected the testimony offered by defendant as to mitigation does not translate into this Court holding that the trial court failed to consider the issue. Accordingly, defendant has failed to show that the trial court erred with respect to its consideration of her potential for rehabilitation.

In addition, the trial court considered the circumstances of the offense and noted that defendant was involved in planning the attack. The evidence showed that defendant was intricately involved in the plot to kill her parents. She formulated the idea and took steps to facilitate the killings. She drew a map to help direct her codefendants to her parents and she took action to prevent her brother Jeffrey, a trauma nurse, from rendering aid. She sent text messages to the codefendants leading up to the attack. Defendant agreed that she had an opportunity to stop the attacks before they happened, but she did not do so.

The trial court also considered defendant's home environment. The trial court rejected the theory that defendant's very early childhood was unstable, noting that defendant testified that she grew up in a loving and supportive home, with her family actively involved in her schooling and every aspect of her life.

The trial court also considered defendant's testimony. Defendant acknowledged that she understood the consequences of her plan to kill her parents. She admitted that she wanted her parents dead, and she agreed that there was no way to justify what she did. Defendant admitted that she attempted to manipulate a psychiatric and psychological assessment and that she hoped to alter her life-without-parole sentence. Defendant agreed that she did not feel depressed or have significant difficulty in school. She felt welcome in the Skinner home, and her uncle attended most of her extracurricular activities. Defendant agreed that her codefendant did not formulate the plan to kill her parents and she agreed that she chose to proceed with the plot. Defendant stated that she thought that she would escape detection for the attacks and would continue living her life. She agreed that she had an opportunity to stop the attacks, but she did

not do so and that she planned to pay her codefendants from funds leftover from her college scholarship. The trial court concluded that this testimony "reputed the allegations that were the basis for [defendant's] claims." Finally, the trial court considered defendant's potential for rehabilitation and concluded that it could not "weigh her potential for rehabilitation within any range of predictable outcomes."

On this record, it is apparent that the trial court did what was requested on remand when it considered defendant's "youth and attendant characteristics" before sentencing defendant to life without the possibility of parole as required by *Miller*. See *Skinner*, 502 Mich at 131 (quotation marks and citation omitted). The trial court considered the factors articulated in *Miller* and set forth the aggravating circumstances that it considered while allowing defendant the opportunity to present evidence, after which the trial court articulated rationale in support of its sentencing decision. See MCL 769.25(6) and (7). Our review of the trial court's considerations and the factors employed, lead us to conclude that the trial court adequately considered the relevant evidence and the sentence it imposed did not violate the principle of proportionality. *Milbourn*, 435 Mich at 636; *Steanhouse*, 500 Mich at 471.

Defendant also argues on appeal that the trial court violated her due process rights when it declined to impose a burden of proof on the prosecution. However, this argument is governed by our Supreme Court's holding in *Skinner*, 502 Mich at 131. Specifically, our Supreme Court explained that, in sentencing a juvenile defendant under MCL 769.25, a trial court is not required to make any explicit findings. *Id*. The trial court need not find that a defendant is irreparably corrupt or that a defendant is a rare juvenile offender. *Id*. Rather, a trial court must simply consider "an offender's youth and attendant characteristics . . . ." *Id*. at 131 (quotation marks and citation omitted). Moreover, MCL 769.25 does not require the prosecution to meet a burden of proof. Accordingly, the trial court did not err in declining to impose a burden of proof at resentencing.

Defendant also argues on appeal that the trial court erred in (1) considering victim-impact statements offered by Mara's brothers Jeff and Marcel, (2) erred in considering a video depicting the life of victim Paul Skinner, (3) erred in considering transcripts from a prior sentencing hearing, and (4) erred in considering opinions of defendant's parole officers contained in the PSIR wherein the officers recommended a life-without-parole sentence.

Although Jeff and Marcel did not fall within the definition of "victim" for purposes of the Crime Victim's Rights Act, MCL 780.752(1)(*i*), this Court has recognized a trial court's broad discretion in considering statements by victims who do not technically satisfy MCL 780.752(1)(*i*). See *People v Albert*, 207 Mich App 73, 74-75; 523 NW2d 825 (1995) (noting that "a sentencing court is afforded broad discretion in the sources and types of information to be considered when imposing a sentence, including relevant information regarding the defendant's life and characteristics"). Moreover, at a *Miller* sentencing hearing, a trial court may consider "evidence presented at trial together with *any evidence* presented at the sentencing hearing." MCL 769.25(7) (emphasis added). Accordingly, MCL 769.25(7) allows the trial court to consider all of the evidence complained of by defendant. We accordingly assign no error to the trial court's consideration of this evidence.

In conclusion, the trial court's sentence did not violate the principle of proportionality and the trial court did not commit legal error in conducting the resentencing hearing. Accordingly, the trial court did not abuse its discretion in sentencing defendant to life imprisonment without the possibility of parole.

Affirmed.

/s/ David H. Sawyer
/s/ William B. Murphy
/s/ Stephen L. Borrello